UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| OSCAR H. VILLANUEVA, | ) Case No. 1:11-cv-01050-AWI-SAB (PC) |
|---|---|
| Plaintiff, | ) |
| v. | ) FINDINGS AND RECOMMENDATIONS RECOMMENDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BE GRANTED |
| M. D. BITER, et al., | ) |
| Defendants. | ) [ECF No. 48] |

Plaintiff Oscar H. Villanueva is appearing pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983.

Currently before the Court is Defendants' motion for summary judgment, filed July 12, 2017. (ECF No. 48.)

**I.**

**RELEVANT HISTORY**

This action is proceeding against Defendants M.D. Biter and S. Lopez for deliberate indifference to Plaintiff's health and safety in violation of the Eighth Amendment.

Defendants filed an answer to the complaint on August 18, 2016. On August 22, 2016, the Court issued the discovery and scheduling order. Upon a showing of good cause, the Court twice extended the deadline for Defendants to file a dispositive motion. As previously stated, Defendants

1

filed a motion for summary judgment on July 12, 2017.[1]  Although Plaintiff received three extensions of time to file an opposition, no opposition was filed and the time to do has expired.  Accordingly, the motion is deemed submitted for review without oral argument pursuant to Local Rule 230(*l*).

## II.

## LEGAL STANDARD

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mut. Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011).  Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1) (quotation marks omitted).  The Court may consider other materials in the record not cited to by the parties, but it is not required to do so.  Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

In resolving cross-motions for summary judgment, the Court must consider each party's evidence.  Johnson v. Poway Unified Sch. Dist., 658 F.3d 954, 960 (9th Cir. 2011).  Plaintiff bears the burden of proof at trial, and to prevail on summary judgment, he must affirmatively demonstrate that no reasonable trier of fact could find other than for him.  Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  Defendants do not bear the burden of proof at trial and in moving for summary judgment, they need only prove an absence of evidence to support Plaintiff's case.  In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010).

In judging the evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, Soremekun, 509 F.3d at 984 (quotation marks and

---

[1] Concurrently with their motion for summary judgment, Defendants served Plaintiff with the requisite notice of the requirements for opposing the motion.  Woods v. Carey, 684 F.3d 934, 939-41 (9th Cir. 2012); Rand v. Rowland, 154 F.3d 952, 960-61 (9th Cir. 1998).

citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted).

In arriving at this recommendation, the Court has carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties. Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this Court did not consider the argument, document, paper, or objection. This Court thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate.

### III.

### SUMMARY OF PLAINTIFF'S COMPLAINT

Plaintiff alleges that Defendants Biter and Lopez were responsible for the operations at Kern Valley State Prison ("KVSP"). Plaintiff states that four years prior to KVSP opening, the Environmental Protection Agency ordered a reduction in the maximum level of arsenic in drinking water to ten parts per billion. According to Plaintiff, KVSP opened in 2005 knowing that it had a serious environmental problem. (Compl. 3,[2] ECF No. 1.) Plaintiff contends that Defendants Biter knew of the environmental hazard and disregarded the substantial risk of harm due to a lack of drinkable water. (Id. at 3.)

Plaintiff alleges that Defendant Lopez was aware that there was arsenic in the drinking water, but did not attempt to correct the dangerous condition by providing emergency measures or an antidote for exposure to the poison. (Id. at 4.) Plaintiff states that he has health problems. (Id. at 3.) Plaintiff claims that the notice of December 20, 2010 is torture because he has been exposed to arsenic and cannot change his water consumption. (Id. at 4.)

///
///

---

[2] All references to pagination of specific documents pertain to those as indicated on the upper right corners via the CM/ECF electronic court docketing system.

3

# IV.

# DISCUSSION

Defendants move for summary judgment because the levels of arsenic detected in Kern Valley's wells did not present any actual danger to Plaintiff, and Plaintiff did not suffer any actual harm from the water that he consumed. Thus, Defendants argue they are entitled to summary judgment because the water was not dangerous, and they were not deliberately indifferent. In the alternative, Defendants argue they are entitled to qualified immunity because it was not clearly established that it was unconstitutional to allow inmates to consume water that they were informed was not dangerous, but violated a regulation.

### A. Defendants' Request for Judicial Notice

Concurrently with their motion for summary judgment, Defendants have filed a request for judicial notice of the California Department of Corrections and Rehabilitation, Quarterly Status Report of Capital Outlay Projects for the California Department of Corrections and Rehabilitation, Arsenic Removal Water Treatment System (March 31, 2013), available at http://www.cdcr.ca.gov/fpcm/docs/FPCM-March_2013_Quarterly _Report.pdf (Exhibit G), and the State Water Resources Control Board, Division of Water Quality GAMA Program, Groundwater Information Sheet, Arsenic (revised July 6, 2010) (Exhibit H). (ECF No. 48-3.)

Under Federal Rule of Evidence 201(b), the Court can take judicial notice of facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Jespersen v. Harrah's Operating Co., Inc., 444 F.3d 1104, 1110 (9th Cir. 2006) (en banc). The Court may take judicial notice of the records and reports of administrative bodies. Winnemem Wintu Tribe v. U.S. Dep't of Interior, 725 F.Supp.2d 1119, 1131 (E.D. Cal. 2010). The Court's authority includes taking judicial notice of government reports. Mobil Oil Corp. v. Tennessee Val. Auth., 387 F.Supp. 498, 500 fn.1 (N.D. Ala. 1974) (taking judicial notice of Tennessee Valley Authority reports).

Defendants' request for judicial notice is granted. See Sacramento Cnty. Retired Employees Ass'n v. Cnty. of Sacramento, 975 F.Supp.2d 1150, 1154 (E.D. Cal. 2013), appeal dismissed (Jan. 16, 2014) (taking judicial notice of staff reports to County Board of Supervisors); see also Coppola v.

Smith, 935 F.Supp.2d 1013 (E.D. Cal. 2013) (court took judicial notice of EPA documents containing test results of groundwater).

### B. Statement of Undisputed Facts[3]

1. Plaintiff Oscar Villanueva is an inmate in the custody of the California Department of Corrections and Rehabilitation (CDCR). (Dep. of Pl. (Heath Decl. Ex. J) at 10:15-24.)

2. Plaintiff arrived at Kern Valley State Prison on August 26, 2010, and was housed there until September 14, 2011. (Health Decl. Ex. J at 25:4-8; Pl's Responses to Def Biter's Interrogatories Set One (Heath Decl. Ex. I) at 3:25-28.)

3. Plaintiff was also housed at Kern Valley from February 19, 2014, to the present. (Heath Decl. Ex. I at 3:25-28.)

4. M. Biter became Kern Valley's acting Warden in August 2010, and was named the Warden in February 2013. He was the Warden until November 2015. (Biter Decl. at ¶ 2.)

5. S. Lopez, is a medical doctor and the Chief Medical Executive at Kern Valley. She became the CME in 2007. (Lopez Decl. at ¶ 1.)

6. In 2001, the United States Environmental Protection Agency (EPA) updated its maximum contamination level (MCL) to 0.010 milligrams per liter (mg/l) or (10 micrograms per liter [mcg/1] or 10 parts per billion) of arsenic. This standard did not become effective until 2006. (Wise Decl. at ¶ 4; 40 C.F.R. § 141.62.)

7. The State of California adopted the EPA's arsenic MCL standard on November 28, 2008. (Wise Decl. at ¶ 4; Cal. Code Regs. tit. 15, § 64431.)

8. Kern Valley has always tested the drinking water produced by its two wells for contaminants and provides the test results to the California Department of Health and continues to do so to this day. (Wise Decl. at ¶¶ 8-9.)

9. During the time Plaintiff was incarcerated at Kern Valley between August 2010 and

---

[3] Plaintiff neither admitted nor denied the facts set forth by Defendants as undisputed nor filed a separate statement of disputed facts. Local Rule 56-260(b). Therefore, the Court was left to compile the summary of undisputed facts from Defendants' statement of undisputed facts and Plaintiff's verified complaint. A verified complaint in a pro se civil rights action may constitute an opposing affidavit for purposes of the summary judgment rule, where the complaint is based on an inmate's personal knowledge of admissible evidence, and not merely on the inmate's belief. McElyea v. Babbitt, 833 F.2d 196, 197-98 (9th Cir. 1987) (per curium); Lew v. Kona Hospital, 754 F.2d 1420, 1423 (9th Cir. 1985); F.R.C.P. 56(e).

September 2011, Kern Valley's wells were less than half the prior MCL of 0.050 mg/L, with a quarterly average between 0.014 mg/L and 0.020 mg/L. (Wise Decl. at ¶¶ 5, 10, Ex. A.)

10. As of July 6, 2010, 1,375 wells of 10.425 wells sampled in California had arsenic concentrations above the MCL. Kern County is one of the counties with the most wells above the arsenic MCL. (Req. for Jud. Not (RJN) at Ex. H.)

11. Kern Valley's wells provide water for the entire facility. (Wise Decl. at ¶ 3.)

12. Kern Valley provides the same water to staff and inmates. (Wise Decl. ¶ 3.)

13. Kern Valley posted quarterly notices reporting arsenic levels. The notices conformed with the ones the Department of Public Health required Kern Valley to post. (Wise Decl. at ¶ 10, Ex. A.)

14. The quarterly notices stated that the arsenic levels at Kern Valley did not present an emergency. (Wise Decl. Ex. A.)

15. The quarterly notices stated that inmates did not need to use an alternative water source. (Wise Decl. Ex. A.)

16. Kern Valley provided annual consumer confidence reports about its water to staff and inmates. (Wise Decl. Ex. B.)

17. Long-term consumption of very large amounts of arsenic in drinking water can cause very specific skin lesions; skin, bladder, and lung cancers; cardiovascular and cerebrovascular diseases; and diabetes mellitus. But the diseases typically require exposure periods of twenty years or more and exposure to drinking water with arsenic concentrations of generally more than 200 mcg/L or 200 parts per billion (ppb) (0.2 mg/L). (Geller Decl. at ¶ 12.)

18. Even if a person drank water containing the levels of arsenic in Kern Valley's drinking water for an entire lifetime, it is unlikely that any adverse health effects related to arsenic would occur. (Geller Decl. at ¶ 21.)

19. No doctor has ever diagnosed any of Plaintiff's alleged conditions as being caused by arsenic. (Heath Decl. Ex. J at 59:6-8.)

20. Dr. Lopez did not have the responsibility or authority to alter the way Kern Valley received its drinking water or authorize a way to bring Kern Valley's water into compliance with the

maximum contaminant level. (Lopez Decl. at ¶ 8.)

21. As part of Dr. Lopez's work as the CME, she never observed any increased incidents of diseases that are associated with ingesting water that contained arsenic. (Lopez Decl. at ¶ 12.)

22. In 2008, Kern Valley's medical staff reported receiving inquiries from inmates regarding Kern Valley's arsenic levels, and Dr. Lopez responded by contacting the California Poison Control System, Fresno/Madera, to inquire as to the possible health concerns raised by the levels of arsenic detected in the water at Kern Valley. (Lopez Decl. at ¶ 10, Ex. F.)

23. R. Geller, M.D., M.P.H., from California Poison Control, responded to Dr. Lopez that there were zero expected health problems, acute or chronic, presented by the arsenic at a concentration of 22 parts per billion, such as Kern Valley's water. (Lopez Decl. at ¶ 11, Ex. F.)

24. Dr. Geller stated that there was no need for other public-health actions. (Lopez Decl. at ¶ 11, Ex. F.)

25. Plaintiff never requested medical care directly from Dr. Lopez for any medical conditions associated with consuming arsenic. (Lopez Decl. at ¶ 18; Heath Decl. Ex. J at 65:25-66:9, 66:23-67:5.)

26. Dr. Lopez was never made aware of Plaintiff being denied care for any medical condition. (Lopez Decl. at ¶ 17.)

27. The process of installing an arsenic removal plant at Kern Valley began around the time that Kern Valley was constructed in 2005 and continued until it was completed in December 2012 to January 2013. (Wright Decl. at ¶ 9; RJN at Ex. G.)

28. Installing an arsenic removal plant is a long process that requires funding through a capital outlay budget change, planning, design, and input from consultants, engineers, Depart of Corrections and facility officials, and a number of state agencies. (Wright Decl. at ¶ 7.)

29. Kern Valley's plant required funding through a capital outlay, which is an expenditure for fixed-assets such as buildings, and plants, and requires a special request for funding that must proceed through the Department of Finance. (Wright Decl. at ¶ 8; RJN at Ex. G.)

30. The original funding allocated for the plant was insufficient based on the Preliminary Plans and was returned, but in May 2009 the Public Works Board approved funds from General Fund

AB 900 to modify the drawings and complete construction. (Wright Decl. at ¶ 10; RJN at Ex. G.)

31.   As the Warden, Defendant Biter did not have the personal authority to authorize a project the size of the arsenic-removal plant. (Biter Decl. at ¶ 5.)

32.   When Defendant Biter was made the acting Warden, it had already been determined that the best approach to bringing the water into compliance with the maximum containment levels would be to install an arsenic removal plant at Kern Valley. (Biter Decl. at ¶ 4.)

33.   Defendant Biter was informed of Dr. Lopez's inquiry and the opinion that there were no expected health concerns from Kern Valley's water supply. (Biter Decl. at ¶ 11.)

34.   Defendant Biter was never informed that the arsenic levels in Kern Valley's drinking water presented a danger to Plaintiff. (Biter Decl. at ¶ 12.)

35.   Plaintiff never personally spoke to Defendant Biter or wrote to him about his conditions related to arsenic. (Heath Decl. Ex. J at 66:10-15.)

36.   While he was acting Warden and Warden, Defendant Biter and his staff transmitted monthly water tests to the California Department of Public Health, posted quarterly notices required by the Department of Health regarding the arsenic levels, and provided consumer confidence reports. (Biter Decl. at ¶ 9; Wise Decl. Exs. A & B.)

37.   Defendant Biter deferred to the expertise of Kern Valley and Department of Corrections' staff on matters regarding arsenic compliance. The staff working on the removal plant would report back to Defendant Biter regarding the progress of the planning, design, and installation of the plant. (Biter Decl. at ¶ 7; Wise Decl. at ¶ 16.)

38.   Kern Valley considered drilling new wells or installing point-of-use filters at the prison, but the alternatives were not viable because of cost, feasibility of correcting the issue, and the lack of a health risk. (RJN Ex. G; Wise Decl. at ¶ 17.)

39.   Kern Valley's staff provided input on the design of the arsenic removal plant and attended weekly meetings regarding the project during construction. (Wise Decl. at ¶ 16.)

40.   During the design phase, other arsenic-removal facilities were toured in order to determine the type of facility that would be best for Kern Valley. (Wright Decl. at ¶ 12.)

41.   The Department of Corrections also considered the possibility of connecting to the City

of Delano's water system, and conducted an analysis of the possibility, but determined that a Kern Valley stand-alone plant was the best option. (Wright Decl. at ¶ 13; RJN Ex. G.)

42. A pilot test of the technology chosen for the plan was conducted at Kern Valley to make sure that the future plant would meet Kern Valley's filtration needs. (Wright Decl. at ¶ 15.)

43. Construction on the arsenic removal plant at Kern Valley began in October 2011, and continued until finished in December 2012. The plant was completed and the project closed in January 2013. (Wright Decl. at ¶ 16; Wise Decl. at ¶ 15; Ex. E; RJN Ex. G.)

44. Kern Valley's plant used a coagulation/filtration process. This is considered the best available technology. (Wright Decl. at ¶ 16; 40 C.F.R. § 141.62(c).)

45. Since completion of the Kern Valley arsenic removal plant, Kern Valley has been in compliance with the MCL. (Biter Decl. at ¶ 10; Wise Decl. at ¶ 19.)

46. Kern Valley was never ordered to stop providing water from its wells to staff or inmates and its permit to provide water was not revoked. (Wise Decl. at ¶ 20.)

**C.     Analysis and Findings on Defendants' Motion**

As previously stated, Defendants move for summary judgment because the levels of arsenic detected in Kern Valley's wells did not present any actual danger to Plaintiff, and Plaintiff did not suffer any actual harm from the water that he consumed. Thus, Defendants argue they are entitled to summary judgment because the water was not dangerous, and they were not deliberately indifferent. In the alternative, Defendants argue they are entitled to qualified immunity because it was not clearly established that it was unconstitutional to allow inmates to consume water that they were informed was not dangerous, but violated a regulation.

1.     Personal Participation by Defendant Lopez

Plaintiff's claim against Defendant Dr. Susan Lopez, Chief Medical Executive, is based on his allegation that Kern Valley's medical department failed to provide him blood tests. (Heath Decl. Ex. J at 67:19.)

Supervisory personnel may not be held liable under section 1983 for the actions of subordinate employees based on *respondeat superior*, or vicarious liability. Crowley v. Bannister, 734 F.3d 967, 977 (9th Cir. 2013); accord Lemire v. California Dep't of Corr. and Rehab., 726 F.3d 1062, 1074-75

(9th Cir. 2013); Lacey v. Maricopa County, 693 F.3d 896, 915-16 (9th Cir. 2012) (en banc). "A supervisor may be liable only if (1) he or she is personally involved in the constitutional deprivation, or (2) there is a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." Crowley, 734 F.3d at 977 (citing Snow v. McDaniel, 681 F.3d 978, 989 (9th Cir. 2012) (internal quotation marks omitted); accord Lemire, 726 F.3d at 1074-75; Lacey, 693 F.3d at 915-16. "Under the latter theory, supervisory liability exists even without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of a constitutional violation." Crowley, 734 F.3d at 977 (citing Hansen v. Black, 885 F.2d 642, 646 (9th Cir. 1989)) (internal quotation marks omitted).

The undisputed facts demonstrate the Defendant Lopez did not personally participate in Plaintiff's alleged constitutional violation. In fact, Defendant Lopez did not have the responsibility or authority to alter Kern Valley drinking water, or authorize any changes to bring it into compliance with the maximum contaminant level. (UDF[4] 20.) In addition, it is undisputed that Defendant Lopez did not have any personal involvement in Plaintiff's medical care. Indeed, Plaintiff admits that he never actually requested medical care directly from Defendant Lopez. (UDF 25.) Accordingly, Defendant Lopez was never made aware of any concerns that Plaintiff had with his health condition. (UDF 26.) Based on the undisputed facts, Defendant Lopez cannot be held liable for Plaintiff's alleged constitutional violations because she did not personally participate in any of them and there is no respondeat superior liability under section 1983. Even if Plaintiff established personal participation on the part of Defendant Lopez, for the reasons explained below, there is no genuine issue of material fact that Defendant acted with deliberate indifference.

    2. <u>Deliberate Indifference to Plaintiff's Health and Safety</u>

The Eighth Amendment's prohibition against cruel and unusual punishment protects prisoners not only from inhumane methods of punishment but also from inhumane conditions of confinement. Morgan v. Morgensen, 465 F.3d 1041, 1045 (9th Cir. 2006) (citing Farmer v. Brennan, 511 U.S. 825,

---

[4] "UDF" refers to the Statement of Undisputed Facts above in section B.

847 (1994) and Rhodes v. Chapman, 452 U.S. 337, 347 (1981)) (quotation marks omitted). While conditions of confinement may be, and often are, restrictive and harsh, they must not involve the wanton and unnecessary infliction of pain. Morgan, 465 F.3d at 1045 (citing Rhodes, 452 U.S. at 347) (quotation marks omitted). Thus, conditions which are devoid of legitimate penological purpose or contrary to evolving standards of decency that mark the progress of a maturing society violate the Eighth Amendment. Morgan, 465 F.3d at 1045 (quotation marks and citations omitted); Hope v. Pelzer, 536 U.S. 730, 737 (2002); Rhodes, 452 U.S. at 346.

Prison officials have a duty to ensure that prisoners are provided adequate shelter, food, clothing, sanitation, medical care, and personal safety, Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2000) (quotation marks and citations omitted), but not every injury that a prisoner sustains while in prison represents a constitutional violation, Morgan, 465 F.3d at 1045 (quotation marks omitted). To maintain an Eighth Amendment claim, a prisoner must show that prison officials were deliberately indifferent to a substantial risk of harm to his health or safety. Farmer, 511 U.S. at 847; Thomas v. Ponder, 611 F.3d 1144, 1150-51 (9th Cir. 2010); Foster v. Runnels, 554 F.3d 807, 812-14 (9th Cir. 2009); Morgan, 465 F.3d at 1045; Johnson, 217 F.3d at 731; Frost v. Agnos, 152 F.3d 1124, 1128 (9th Cir. 1998).

### a. Objective Element

Under the objective element of the Eighth Amendment, there must be a substantial risk of serious harm. Farmer, 511 U.S. at 834. That is, prison officials cannot ignore a condition of confinement "that is sure or very likely to cause serious illness." Helling v. McKinney, 509 U.S. 25, 33 (1993). Thus, Plaintiff must prove that he was exposed to an unreasonably high level of arsenic. Id. at 35. Defendants need only prove an absence of evidence to support Plaintiff's case. In re Oracle Corp. Sec. Litig., 627 F.3d at 387.

Defendants have presented evidence that Kern Valley's water did not present an objectively serious risk of harm. In 2001, the EPA updated its maximum contamination level (MCL) to 0.010 milligrams per liter (mg/L) (or 10 micrograms per liter [mcg/L] or 10 parts per billion) of arsenic. This standard did not become effective until 2006 (UDF 6.) The State of California adopted the EPA's arsenic MCL standard on November 28, 2008. (UDF 7.) At the relevant time at issue in this

case, Plaintiff consumed water with concentrations of arsenic between arsenic 0.014 mg/L and 0.020 mg/L. (UDF 9.) This was substantially under the prior EPA and California maximum contaminant level of 0.050 mg/L. (Id.) All U.S. public drinking water contains arsenic at some concentration, and the difference between a medicine and a poison is the dose. (Geller Decl. ¶ 24d.)

Dr. R. Geller, a physician who is board certified in internal medicine, medical toxicology, and emergency medicine and medical toxicology, and who is employed by the California Poison Control System as Medical Director and Managing Director, declared that no study has ever demonstrated that the levels of arsenic in Kern Valley's water causes disease. (Geller Decl. at ¶¶ 21-22.) Further, there is no evidence that predicts illness from ingesting drinking water with an arsenic concentration of 22 mcg/L or 0.022 mg/L, such as Kern Valley's water. (Geller Decl. at ¶¶ 22, 24b, 24d.) Dr. Geller declared and opined that even if a person drank water containing the levels of arsenic in Kern Valley's drinking water for an entire lifetimes, it is unlikely that any adverse health effects related to arsenic would occur. (Geller Decl. at ¶ 21.) The water Kern Valley provided to Plaintiff contained arsenic concentrations that were safe to drink. (Geller Decl. at ¶ 24b.)

With respect to Plaintiff medical condition, Dr. Geller attested that Plaintiff did not become ill from ingesting the arsenic concentrations in Kern Valley's drinking water. (Geller Decl. at ¶¶ 11, 23, 24c; Lopez Decl. at ¶ 15.) Furthermore, Plaintiff future health will not be affected from consuming Kern Valley's drinking water between August 26, 2010, and September 14, 2011, and he does not have any appreciable risk of developing any diseases associated with ingesting arsenic. (Geller Decl. at ¶¶ 11, 24e.) Moreover, although Plaintiff contends he suffered a number of symptoms from consuming the water, it is undisputed that no doctor has ever diagnosed any of Plaintiff's alleged conditions as being caused by arsenic. (Heath Decl. Ex. J at 59:6-8.)

Plaintiff also fails to demonstrate that the risk of arsenic exposure is "so grave that it violates contemporary standards of decency to expose anyone unwilling to such a risk." Helling, 509 U.S. at 36. In this instance, the evidence demonstrates that 2010, 1.375 of the more than ten thousand wells tested in California had MCL concentrations above the MCL. (UDF 10.) Kern County, where Kern Valley is located, is one of the counties with the most wells out of compliance. (Id.) In fact, Kern Valley's wells provided the same water to staff and inmates. (UDF 12.) The quarterly notices posted

stated that the arsenic levels at Kern Valley did not present an emergency, and inmates were not required to use an alternative water source. (UDF 14, 15.) Furthermore, Kern Valley was never ordered to stop providing water from its wells to staff or inmates and its permit to provide water was not revoked. (UDF 46.)

The Court finds that Defendants have met their burden on summary judgment by producing evidence that drinking water containing arsenic in concentrations of less than 0.050 mg/L is safe to consume, and there is no evidence to demonstrate that drinking water with an arsenic concentration of 22 mcg/L or 0.022 mg/L, such as Kern Valley's water posed a risk to Plaintiff's health. In addition, there is no link to any medical consequences that Plaintiff suffered as a result of the arsenic levels at Kern Valley. Plaintiff has failed to rebut Defendants' evidence, and Defendants are therefore entitled to summary judgment.

### b. Subjective Element

Irrespective of the failure to meet the objective element of the Eighth Amendment claim, Plaintiff also fails to meet the subjective element of his claim. Helling, 509 U.S. at 35 (failure of proof as to the objective or subjective element is fatal to Eighth Amendment claim.) The subjective inquiry determines whether Defendants acted with deliberate indifference to the objectively serious risk of harm. Farmer, 511 U.S. at 833-34. Defendants can only be liable if they knew of an excessive risk of harm and disregarded the risk. Id. at 838. That is, Defendants must be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [the Defendant] must [] draw the inference." Id.

#### 1). Defendant Lopez

As previously determined, Defendant Lopez, as Chief Medical Executive, did not have the responsibility or authority to address Kern Valley's drinking water, nor was she involved in Plaintiff's medical care or ever made aware of any issues that he with his care. Nonetheless, the evidence demonstrates that Defendant Lopez was deliberately indifferent. In 2008, when Kern Valley's medical staff received inquiries from inmates regarding Kern Valley's arsenic levels, Dr. Lopez responded by contacting the California Poison Control System, Fresno/Madera, to inquire as to the possible health concerns raised by the levels of arsenic in the water at Kern Valley. (UDF 22.) Dr.

1  Geller responded to Dr. Lopez advising her that there were no expected health problems, acute or chronic, presented by the arsenic at a concentration level of 22 parts per billion, such as Kern Valley's water. (UDF 23.) Accordingly, based on Dr. Lopez's inquiry and Dr. Geller's response, there is no showing that Defendant Lopez was deliberately indifference to Plaintiff's health. Farmer, 511 U.S. at 845.

However, even assuming Defendant Lopez knew that Plaintiff was not satisfied with the failure to provide him a blood test, there can be no liability because a difference of opinion between Plaintiff and medical staff regarding the proper course of treatment is not deliberate indifference. Snow v. McDaniel, 681 F.3d at 987 (citing Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989)), overruled in part on other grounds, Peralta v. Dillard, 744 F.3d 1076, 1082-83 (9th Cir. 2014); Wilhelm v. Rotman, 680 F.3d 1113, 1122-23 (9th Cir. 2012) (citing Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1986)). In addition, it has been established that Kern Valley's water did not present a danger to Plaintiff and would not cause any illness. Furthermore, Dr. Geller attested that medical staff's decision not to provide blood tests met the standard because Plaintiff did not have any symptoms that would warrant the use of the tests. (Geller Decl. at ¶ 16.) Based on the evidence presented, Defendant Lopez was not deliberately indifferent to Plaintiff's health and safety, and summary judgment should be granted.

2). Defendant Biter

It is undisputed that at the time Defendant Biter became the acting Warden of Kern Valley in 2010, the process of bringing Kern Valley's drinking water into compliance with the new MCL was already underway. Indeed, the process began when Kern Valley was opened in 2005. (UDF 27.) At the time Defendant Biter became acting Warden, officials had already considered other options and solutions and determined the best approach was to install an arsenic removal plan. (UDF 32, 45, 47-49, 51.) Construction of the arsenic removal plant at Kern Valley began in October 2011, and continued until finished in December 2012. The plant was completed and the project was closed in January 2013. (UDF 43.) Since that time, Kern Valley's drinking water has been in compliance with the MCL. (UDF 45.)

///

The evidence presented demonstrates that Kern Valley's officials did not ignore the issue but rather investigated and made reasonable attempts to resolve the issue. Defendant Biter and his staff provided monthly water tests to the California Department of Public Health, posted quarterly notices required by the Department of Health regarding the arsenic levels, and provided consumer confidence reports. (UDF 36.) Defendant Biter deferred to the expertise of Kern Valley and Department of Corrections' staff who would report back to him regarding the progress of the planning, design, and installation of the arsenic removal plant. (UDF 37.) Kern Valley considered drilling new wells or installing point-of-use filters, but these alternatives were not feasible given the appropriate considerations. (UDF 38.) Kern Valley's staff provided input on the design of the arsenic removal plant and attended weekly meetings during construction. (UDF 39.) In addition, during the design phase, other arsenic-removal facilities were toured in order to determine the best approach for Kern Valley. (UDF 40.) The Department of Corrections also considered the possibility of connecting to the City of Delano's water system, but ultimately determined that a Kern Valley stand-alone plant was the best option. (UDF 41.) Kern Valley's plant used a coagulation/filtration process which is considered a best available technology. (UDF 44.)

Moreover, the evidence supports the finding that Defendant Biter was not aware of any serious risk of harm. Defendant Biter was informed of Dr. Lopez's inquiry and the opinion that there were no expected health concerns from Kern Valley's water supply. (UDF 33.) The quarterly notices that were posed indicated the arsenic levels at Kern Valley did not present an emergency and there was no need to use an alternative water source. (UDF 14, 15.) It was reported that the water was safe to drink. (Geller Decl. at ¶ 24b). Based on the evidence presented, Defendant Biter was never aware that Kern Valley's water presented a risk to Plaintiff and summary judgment is appropriate.[5]

///
///
///
///

---

[5] Because the Court has found that Defendants are entitled to judgment on the merits, the Court does not reach Defendants' alternative argument that they are entitled to qualified immunity.

## V.

## RECOMMENDATIONS

Based on the foregoing, it is HEREBY RECOMMENDED that:

1. Defendants' motion for summary judgment be granted; and

2. Judgment be entered in favor of Defendants.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within **thirty (30) days** after being served with these Findings and Recommendations, the parties may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **December 6, 2017**

UNITED STATES MAGISTRATE JUDGE